DOMINICK DURANTE, Respondent, *v.* ANNIE EANNACO (Formerly ANNIE DIMIERE), Appellant, Impleaded with Others.

*Payment by a widow, under threats, of a mortgage on land left by her husband — when the amount thus paid will be allowed to her on a partition sale.*

Where a man dies intestate possessed of no personal property, but seized of certain premises subject to a mortgage, leaving him surviving a widow and several infant children, and the widow, under stress of threats made by the mortgagee to " take the house back," or to " sell the house," if the mortgage was not paid, pays the mortgage, partly out of her own funds and partly out of moneys borrowed by her, and procures the same to be canceled and discharged of record, believing that such action is necessary for the protection of her dower and of her children's interest in the property, she is entitled, upon the partition of the property, to be repaid the amount paid by her on account of the mortgage, together with interest from the date of the payment, notwithstanding that the mortgage was not due at the time the payment was made, and could not have been then foreclosed.

APPEAL by the defendant, Annie Eannaco (formerly Annie Dimiere), from an interlocutory judgment of the County Court of Kings county in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 18th day of December, 1900, upon the report and supplemental report of a referee in partition.

*Isidor Buxbaum* and *Frank Mann*, for the appellant.

*Peter P. Huberty*, guardian *ad litem*, for the infant defendants Dimiere.

GOODRICH, P. J.:

This action was for the partition of a house and lot, No. 221 Fourth street, in the borough of Brooklyn. The property was owned by Antonio Dimiere, who died intestate, leaving a widow and four children. Theresa, one of the children, subsequently married the plaintiff and died intestate, leaving her surviving the plaintiff and one child, who has since died. The plaintiff brings this action as heir at law of the deceased child, claiming to be the owner of one undivided fourth part of the premises subject to the right of dower consummate of the widow Annie Dimiere (now Eannaco). The three other children of Antonio are parties defendant, the other defendant being the second wife of the plaintiff.

The defendant, Annie Eannaco, answered, alleging that the prem ises were conveyed to her husband by one O'Connell for " the sum of $3,900, of which sum the sum of $2,400 was to be paid and was paid in cash and the balance by a mortgage of $1,400 ; " that this mortgage was unpaid at the time of his death ; that he left no personal property ; that in order to prevent a foreclosure of the mortgage she paid the amount to O'Connell, and that she also paid taxes, insurance, premiums and repairs, for all of which she prayed that she might be adjudged to have a lien upon the property.

The court adjudged partition and appointed a referee to take proof of the title of the respective parties to the premises and report to the court. The referee made his report, in which he found as follows :

" *Eighth.* The defendant, Annie Eannaco, paid in satisfaction of a mortgage the sum of fourteen hundred dollars, and upon such payment said mortgage was duly canceled and discharged of record, as shown in the 11th finding of fact. There is no evidence before me to show why she made such payment, except that she believed that she was the owner of the premises on the death of her husband ; nothing to show that she was compelled to pay the same to protect her interest or the interest of the children of her deceased husband, or for any reason whatever. I see no escape, therefore, from the conclusion that such payment was voluntary, and being so, she has no claim in this action to recover it back."

To this Mrs. Eannaco excepted, and subsequently the matter was referred back to the referee to take further proof, and upon such

reference Mrs. Eannaco testified that the mortgagee O'Connell "came to my house, and he wanted to be paid, and I was afraid. I was afraid that my children will lose the house. * * * I thought after my husband died the house would have been mine, and then that on my death it would have been my children's house; otherwise I would not have paid a cent. * * * I paid the money because the house was mine. * * * Q. At the time when you made such payment, were any actions pending for the foreclosure of that property, or were any threats made to you that this mortgage would be foreclosed? A. Yes, sir; about the mortgage. Q. What about the mortgage? A. They said, 'If you don't pay I will take the house back.' Q. Who said that? A. The owner who sold me the house, the owner who sold the house to me. Q. And then you made the payment of that mortgage? A. Yes, sir. Q. Would you have made that payment but for those threats? A. In order not to lose the house I made the payment. That was the reason why I did it. * * * Q. What did he (the mortgagee) say to you when he came to you for the money? A. He came there and asked me, 'What are you going to do? Are you going to pay that mortgage? Otherwise I will take the house back.' At the time Mr. Kelly was present. By the Referee: Q. Did Mr. O'Connell say anything to you, at the time he called upon you for the payment of that money, about foreclosing the mortgage? A. He says, 'If you pay me, that will be all right. Otherwise I will sell the house.' And for fear of losing the house, forfeiting the house, I went around and borrowed the money. * * * Q. Do you know for how long that O'Connell mortgage was to run, originally? A. I do not. Q. Do you know, as a matter of fact, that that mortgage was not due until September 21st, 1896? A. I did not know it. Q. The taxes on the house, were they promptly paid during your husband's life? A. Yes, sir."

It appeared that Mrs. Eannaco borrowed the money to pay off the mortgage.

The referee made a supplemental report in which he said : " I find no reason in the testimony taken under the order herein for making a finding different from the finding in my report heretofore submitted in this action. There is no question under all the testimony that the defendant paid the mortgage debt with her own money,

but there was no necessity for its payment. When it was made, the mortgage was not due, and could not be foreclosed. No person could suffer loss because of its non-payment at the time. It is unfortunate for this defendant if she failed to take the advice of some reliable person when she parted with her money, but under settled law, as I understand it, I can see no way to grant her relief. The payment was voluntary, and cannot be recovered back in this action."

Interlocutory judgment was thereupon entered, and the defendant Mrs. Eannaco appeals therefrom.

The appeal raises the question whether Mrs. Eannaco is entitled to be allowed for the money paid by her in satisfaction of the mortgage, upon the equitable doctrine of subrogation or otherwise. Subrogation was a creation of the civil law, but was never recognized to its full extent by the common law. It was called by the civilians a "species of spontaneous agency." "To lay a foundation for a claim of recompense or remuneration on the part of the *negotiorum gestor*, the labor or expense must be bestowed either with the direct intention of benefiting the third party against whom the claim is made, or in the *bona fide* belief that the subject belongs to the person by whom the expense or labor is bestowed."

Mr. Sheldon, in his work on Subrogation ([2d ed.], § 1), says that subrogation is the "substitution of one person in the place of another, whether as a creditor or as the possessor of any other rightful claim;" that "It is treated as the creature of equity, and is so administered as to secure real and essential justice without regard to form, independently of any contractual relations between the parties to be affected by it."

In Pomeroy's Equity Jurisprudence (Vol. 3 [2d ed.], § 1211) it is said: "Under some circumstances, the payment of the amount due on a mortgage, when made by certain classes of persons, is held in equity to operate as an assignment of the mortgage. By means of the payment, the mortgage is not satisfied and the lien of it destroyed, but equity regards the person making the payment as thereby becoming the owner of the mortgage, at least for some definite purposes, and the mortgage as being kept alive, and the lien thereof as preserved for his benefit and security. This equitable result follows, although no actual assignment, written or verbal,

accompanied the payment, and the securities themselves were not delivered over to the person making payment, and even though a receipt was given speaking of the mortgage debt as being fully paid, and sometimes even though the mortgage itself was actually discharged and satisfied of record. This equitable doctrine, which is a particular application of the broad principle of subrogation, is enforced whenever the person making the payment stands in such relations to the premises or to the other parties that his interests, recognized either by law or by equity, can only be fully protected and maintained by regarding the transaction as an assignment to him, and the lien of the mortgage as being kept alive, either wholly or in part, for his security and benefit.

"§ 1212. * * * Equity does not admit the doctrine of equitable assignment in favor of every person who pays off a mortgage. Such relations must exist towards the mortgaged premises or with the other parties, that the payment is not a purely voluntary act, but is an equitably necessary or proper means of securing the interests of the one making it from possible loss or injury. The payment must be made by or on behalf of a person who had some interest in the premises, or some claim against other parties, which he is entitled, in equity, to have protected and secured. A mere stranger, therefore, who pays off a mortgage as a purely voluntary act can never be an equitable assignee. In general, when any person having a subsequent interest in the premises, and who is, therefore, entitled to redeem for the purpose of protecting such interest, and who is not the principal debtor primarily and absolutely liable for the mortgage debt, pays off the mortgage, he thereby becomes an equitable assignee thereof, and may keep alive and enforce the lien so far as may be necessary in equity for his own benefit; he is subrogated to the rights of the mortgagee to the extent necessary for his own equitable protection."

In *Arnold* v. *Green* (116 N. Y. 566) it was said that the remedy of subrogation is no longer limited to sureties and *quasi* sureties, but includes so wide a range of subjects that it has been called the "'mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity and good conscience ought to pay it.'" The court further said (p. 572): "While a mere volunteer, with no obligation to pay or interest to protect, is not entitled to its aid, it is

frequently applied in favor of a vendee of encumbered real estate, who, although not personally liable, has paid the debt of another which is a charge upon the land, and which, if not paid, might cause him to lose his interest therein. Under such circumstances the debt, although paid and satisfied in form, is regarded in equity as neither paid nor satisfied in fact, but by operation of law the former holder ceases to be the creditor, while the person paying takes his place .as owner of the debt and security unimpaired. Where, within the limitations suggested, benefit may result to the person paying without injury to the person who should pay, equity casts the burden upon the latter, who ought in fairness to bear it, provided it will not work injustice or disturb the rights of other creditors of a common debtor."

Again, in *Sanford* v. *McLean* (3 Paige, 117, 122) it was said: "It is only in cases where the person advancing money to pay the debt of a third party stands in the situation of a surety, or is compelled to pay it to protect his own rights, that a court of equity substitutes him in the place of the creditor, as a matter of course, without any agreement to that effect."

In *Union Trust Co.* v. *Monticello & P. J. R. Co.* (63 N. Y. 311, 314) the court said: "There are many cases where money is paid upon mortgages and judgments by persons not parties to them, in which, whether the security shall be regarded as extinguished or held to be in force for the benefit of the party paying, depends upon the intent of the party paying. Equity will keep the securities in life in such cases to promote the ends of justice, but not against any person having a superior equity."

*Acer* v. *Hotchkiss* (97 N. Y. 395) held that a mere volunteer may not invoke the aid of subrogation, as he can establish no equity. But FINCH, J., said (p. 402): "The doctrine of subrogation is a device to promote justice. We shall never handle it unwisely if that purpose controls the effort and the resultant equity is steadily kept in view."

In *Arnold* v. *Green* (*supra*) the term "stranger or volunteer" is clearly defined as follows: "A stranger or volunteer, as those terms are used with reference to the subject of subrogation, is one who, in no event resulting from the existing state of affairs, can become liable for the debt, and whose property is not charged with the pay-

ment thereof and cannot be sold therefor. A payment made by one who was liable to be compelled to make it, or lose his property, will not be regarded as made by a stranger. Where the person paying has an interest to protect he is not a stranger."

In *Ætna Life Ins. Co.* v. *Middleport* (124 U. S. 534, 547, 548) the court said : " One of the principles lying at the foundation of subrogation in equity, in addition to the one already stated, that the person seeking this subrogation must have paid the debt, is that he must have done this under some necessity to save himself from loss which might arise or accrue to him by the enforcement of the debt in the hands of the original creditor ; that, being forced under such circumstances to pay off the debt of a creditor who had some superior lien or right to his own, he could, for that reason, be subrogated to such rights as the creditor, whose debt he had paid, had against the original debtor."

The court quoted from Sheldon on Subrogation (§ 240) as follows : " The doctrine of subrogation is not applied for the mere stranger or volunteer who has paid the debt of another, without any assignment or agreement for subrogation, without being under any legal obligation to make the payment, and without being compelled to do so for the preservation of any rights or property of his own." The court also approved the following language of Chancellor JOHNSON in *Gadsden* v. *Brown & Wellsman* (Speers' Eq. [S. C.] 37), calling it " perhaps as clear a statement of the doctrine on this subject as is to be found anywhere :" " The doctrine of subrogation is a pure unmixed equity, having its foundation in the principles of natural justice, and from its very nature never could have been intended for the relief of those who were in a condition in which they were at liberty to elect whether they would or would not be bound, and, as far as I have been enabled to learn its history, it never has been so applied. If one with the perfect knowledge of the facts will part with his money, or bind himself by his contract in a sufficient consideration, any rule of law which would restore him his money or absolve him from his contract would subvert the rules of social order. It has been directed in its application exclusively to the relief of those that were already bound who could not but choose to abide the penalty."

Through all the cases which are brought to our attention runs the

doctrine that it is only a mere volunteer who is never entitled to subrogation in equity, and we thus come to the question whether Mrs. Eannaco was a mere volunteer. She was the natural guardian of her infant children, then under fourteen years of age. She also had her right of dower consummate in the property. These facts differentiate her position from that of a mere volunteer. What she did was manifestly done for the protection of her dower and of her children's interest in the property. Not only has no injury resulted to the children, but their interest in the property has been increased by her act. Certainly no harm has been worked to them or their estate. The referee found that they had no " other means of support or maintenance than their interest in said premises."

It also appears by the referee's report that Mrs. Eannaco has supported and maintained her infant children since the death of their father ; and she made a claim therefor before the referee, amounting to a sum considerably in excess of the amount of the mortgage, which claim the referee refused to consider as not being within his jurisdiction under the order of reference.

The record shows that the widow was poor and ignorant, unable to speak English and unfamiliar with the matters connected with the transfer or mortgage of real property ; that she was under a misapprehension of the rights of the mortgagee, who had threatened to " take the house back," to " sell the house," and that she was afraid her " children will lose the house," and that she paid off the mortgage under a stress which was great enough to induce her to borrow the larger part of the money necessary to do so. It is clear that she did not appreciate the fact that the mortgage was not due and would not be due for several months, and that no immediate foreclosure could be had, but the fact remains that a time was approaching when it would become due; that her husband had left no personal estate out of which the mortgage could be paid, and that she simply anticipated that period and paid off the mortgage before it was due, under a mistaken idea of her duty under existing conditions. In view of these circumstances it would seem inequitable to hold that Mrs. Eannaco was a mere volunteer, seeking to thrust herself into the position of a creditor of her children or the estate, merely because she had not assumed and was not bound to pay the mortgage at all, and that at the date when she did pay it

it had not matured. Equity will not be swift to interpose a techni-cal legal objection to defeat an equitable claim like that before us.

On the contrary, it is the province of equity to secure real and essential justice without regard to technical defenses. This result may be accomplished either by considering the mortgage as still alive so far as to subrogate Mrs. Eannaco to the position of the mortgagee thereunder, or by giving her a lien upon the premises for the amount of the money paid by her therefor, with interest from the date of such payment.

The interlocutory judgment should be modified so as to give the defendant Mrs. Eannaco a lien upon the premises for the sum of $1,400 and interest from the date of the payment by her of the mortgage to O'Connell, and as modified affirmed, with costs to the appellant and guardian *ad litem* payable out of the fund.

BARTLETT, HIRSCHBERG, JENKS and SEWELL, JJ., concurred.

Interlocutory judgment of the County Court of Kings county modified in accordance with the opinion of GOODRICH, P. J., and as modified affirmed, with costs to the appellant and guardian *ad litem* payable out of the fund.